IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PAUL TRANTHAM                           *

      Plaintiff,                       *

v.                                      *            Case No. TJS-20-2158

PRINCE GEORGE'S COUNTY,                 *
MARYLAND, *et al.*,
                                        *
      Defendants.

\*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

Pending before the Court is the Motion for Summary Judgment ("Motion") (ECF No. 34) filed by Defendants Prince George's County, Maryland (the "County"), Corporal Melvin Fulton ("Corporal Fulton") and Officer Ibrahim Ige ("Officer Ige").[1] Having considered the submissions of the parties (ECF Nos. 34, 36 & 37), I find that a hearing is unnecessary. *See* Loc. R. 105.6. For the following reasons, the Motion will be granted in part and denied in part.

## I.    BACKGROUND

This lawsuit arises from a traffic stop and arrest that occurred in the early morning hours of December 19, 2017. Plaintiff Paul Trantham ("Mr. Trantham") filed his Complaint pursuant to 42 U.S.C. § 1983, basing the Court's jurisdiction on 28 U.S.C. §§ 1331, 1343(a)(4), and 1367.[2] In Count One, he claims that Defendants are liable for violating his Fourth and Fourteenth Amendment Rights, pursuant to § 1983. The remaining claims in the Complaint all arise from Maryland state law. In Count Two, he claims that Defendants are liable for depriving him of

---

[1] In accordance with 28 U.S.C. § 636(c), this case has been referred to me for all proceedings and the entry of judgment by consent of the parties. ECF Nos. 28 & 29.

[2] After filing his Complaint, Mr. Trantham withdrew several claims. ECF No. 30. The Court will only address those claims that have not been withdrawn.

liberty, in violation of Article 24 of the Maryland Declaration of Rights. In Count Three, he asserts a false imprisonment claim against Corporal Fulton and Officer Ige. Finally, in Count Five, he asserts a claim for intentional infliction of emotional distress against Corporal Fulton and Officer Ige. At the conclusion of discovery, Defendants filed their Motion, which is now ripe for decision.

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252.

The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A party may not rest upon the mere allegations or denials of its pleading but instead must cite to "particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

III.    **DISCUSSION**

A.    **The Undisputed Facts**

The following facts are not in genuine dispute. At all relevant times, Corporal Fulton was employed by the Prince George's County Police Department. ECF No. 34-2 at 4. In the early morning hours of December 19, 2017, Corporal Fulton was driving in the vicinity of the 5100 block of Indian Head Highway, Oxon Hill, Prince George's County, Maryland. *Id.* at 5. Corporal Fulton had just completed his shift and was on his way home from work. *Id.* at 9. While he was driving, he noticed a vehicle ahead of him "swerving and hitting the brakes a lot." *Id.* at 5. The driver, later identified as Mr. Trantham, was "swerving back and forth between lane 1 and lane 2" on the two-lane highway. *Id.* Corporal Fulton followed Mr. Trantham's vehicle for approximately one-quarter of a mile. At the intersection of Indian Head Highway and Livingston Road, which is controlled by a red light, Mr. Trantham's vehicle came to a stop in the right lane. *Id.* At the light, Corporal Fulton pulled his cruiser into the left lane beside Mr. Trantham's vehicle. *Id.* Corporal Fulton looked over into Mr. Trantham's vehicle and observed Mr. Trantham appearing to fall asleep at the light. *Id.* Then Corporal Fulton observed Mr. Trantham "digging in his nose." *Id.* According to Corporal Fulton, Mr. Trantham looked like he was "in and out of it," and "appeared as if he was just falling asleep." *Id.* "[H]e was leaning to the left of the door. And then he leaned his head to the right. His finger was in his nose. His eyes were closed." *Id.* at 6. Corporal Fulton also noticed that Mr. Trantham's eyes were bloodshot red, which suggested to him that Mr. Trantham could either be tired or under the influence of narcotics or alcohol. *Id.* at 7.

Corporal Fulton shined a spotlight into Mr. Trantham's vehicle and tapped his air horn to try to get his attention. *Id.* at 5-6. Mr. Trantham looked over at Corporal Fulton but he still appeared to be falling asleep. *Id.* at 5. At Corporal Fulton's request, Mr. Trantham lowered his window.

Corporal Fulton asked him "just to pull over off to the side of the road." *Id.* At that point, Mr. Trantham "just [drove] off." *Id.* at 6. Corporal Fulton pulled his cruiser behind Mr. Trantham's vehicle and activated his emergency equipment to stop him. *Id.* Corporal Fulton's subjective motivation for the traffic stop was to check on Mr. Trantham's welfare and "make sure he was okay." *Id.* Specifically, Corporal Fulton "just wanted to make sure [Mr. Trantham] was okay to drive so he wouldn't hurt himself or anyone else." *Id.*

Mr. Trantham stopped his vehicle. *Id.* Then, even though Corporal Fulton had not asked him to do so, Mr. Trantham opened his car door and stepped out of the vehicle. *Id.* Corporal Fulton considered this unusual. *Id.* Approaching Mr. Trantham, Corporal Fulton "could smell a strong odor of an alcoholic beverage emanating from the defendant's person." *Id.* at 9. Corporal Fulton asked Mr. Trantham if he had been drinking. *Id.* Mr. Trantham "advised he had two Heinekens," a brand of beer.[3] *Id.*

Corporal Fulton notified his dispatcher that he had initiated a traffic stop. *Id.* Mr. Trantham "began shouting," cursing, and saying "that he knows Rushern Baker and he's a certified private investigator." *Id.* at 10, 12. Mr. Trantham appeared irritated and communicated with Corporal Fulton in an aggressive tone. *Id.* at 10-11. Corporal Fulton asked Mr. Trantham to consent to a standard field sobriety test and a breath test (there is a dispute about whether Mr. Trantham agreed to submit to the tests). *Id.* at 10. Around this time, backup officers arrived on the scene, including

---

[3] During his deposition, Mr. Trantham initially testified that he did not remember whether, during the course of the stop, Corporal Fulton asked him if he had been drinking. ECF No. 34-7 at 14. When counsel pointed Mr. Trantham to his responses to Defendants' interrogatories (where he stated that during the stop Corporal Fulton asked him if he had been drinking, and he responded that he had consumed two beers earlier that night, *see* ECF No. 36-3 at 5), Mr. Trantham's memory was refreshed. ECF No. 34-7 at 16. At that point, he remembered that Corporal Fulton had asked him if he had been drinking and that he told him he had consumed "two Heinekens at [his] uncle's house." *Id.*

Officer Ige. ECF No. 34-6 at 4. While on the scene, Officer Ige observed that Mr. Trantham's eyes were glassy with a yellow tint and that Mr. Trantham was "being belligerent" and talking with slurred speech. *Id.* at 5.

Corporal Fulton arrested Mr. Trantham. He removed Mr. Trantham's wallet from his hands and "conducted a pat-down on him to make sure there [were] no weapons." ECF No. 34-2 at 10. He handcuffed Mr. Trantham, placed him in his police cruiser, and impounded Mr. Trantham's vehicle. *Id.* at 13. He conducted "an impound inventory to make sure there was nothing in there that [he needed] to take out." *Id.* Corporal Fulton then transported Mr. Trantham to the district station to conduct the breath test. *Id.* at 13. The Court will not address the events that occurred after Mr. Trantham was transported to the district station because they have no bearing on Mr. Trantham's § 1983 claim in Count One. The events that occurred at the station are only relevant to Mr. Trantham's state law claims.

**B.    Mr. Trantham's "Disputed" Facts**

In his brief in opposition, Mr. Trantham argues that there are genuine disputes of material fact. For the following reasons, the Court disagrees.

Mr. Trantham's brief mischaracterizes the testimony he offered at his deposition. Mr. Trantham disputes Corporal Fulton's testimony that he observed Mr. Trantham's vehicle swerving back and forth on Indian Head Highway (Route 210) prior to its intersection with Livingston Road. ECF No. 36-1 at 4. According to Mr. Trantham, "from what [he] remember[s]," he was traveling "down Oxon Hill Road," when he "went around the curve and came to the light." ECF No. 34-7 at 11. He did not see Corporal Fulton's cruiser until he "was going down Indian Head Highway." *Id.* at 12. At that point, Mr. Trantham noticed Corporal Fulton on his "left-hand side as [he] was going down Indian – 210, Indian Head Highway." *Id.*

This testimony is not sufficient to generate a genuine dispute of fact. Corporal Fulton testified without qualification that he observed Mr. Trantham swerving his vehicle on Indian Head Highway and appearing to fall asleep at the intersection of Indian Head Highway and Livingston Road. Mr. Trantham's testimony does not contradict Corporal Fulton's testimony. First, and most importantly, it is immaterial whether Mr. Trantham was driving on Oxon Hill Road before driving on Indian Head Highway; there is no dispute that Mr. Trantham was traveling on Indian Head Highway on the night of the incident. And it is immaterial whether Mr. Trantham initially saw Corporal Fulton following him or pulling beside him. Corporal Fulton testified that he followed Mr. Trantham on Indian Head Highway, observed him swerving between lanes, and then pulled his cruiser beside him at an intersection. Mr. Trantham has not testified that Corporal Fulton was not following him; he only testified that he didn't notice him. Second, Mr. Trantham's testimony is equivocal ("from what I remember . . ."; "If I remember correctly . . ."). He does not state that he can accurately recall the events on the night of the incident. Third, Mr. Trantham has not presented any evidence (1) that he was not swerving between lanes on Indian Head Highway, (2) that he did not have bloodshot red eyes, (3) that his eyes were not closed when Corporal Fulton pulled his cruiser beside him; (4) or that he did not appear to be falling asleep at the intersection of Indian Head Highway and Livingston Road.

In his brief, Mr. Trantham refers to a map of the area around the intersection of Indian Head Highway and Livingston Road. ECF Nos. 36-1 at 18-20; 36-4 & 36-5. The Court acknowledges Mr. Trantham's testimony that he "came down Oxon Hill Road, [] went around the curve and came to the light." ECF No. 34-7 at 11. But this is the only evidence in the record from Mr. Trantham as to the route he traveled on the night of the incident. This evidence does not contradict Corporal Fulton's testimony. And importantly, Mr. Trantham did not refer to the map

submitted along with his brief during his deposition or in any other potentially admissible evidence. Although he attempts to provide context for the map in his brief, the arguments of counsel are not evidence. *See* Fed. R. Civ. P. 56(c)(1). Mr. Trantham had an opportunity to submit evidence that clarified his deposition testimony about the route he traveled on the night of the incident. Because he failed to do so, the Court finds that he has not generated a genuine dispute on this issue.

Other facts that Mr. Trantham argues are in dispute are not material to the Court's decision. It does not matter whether Corporal Fulton used his air horn to get Mr. Trantham's attention. And it does not matter when Corporal Fulton instructed Mr. Trantham to pull over or whether Mr. Trantham agreed to take the breath test at the district station. The only material issues are whether Corporal Fulton was justified in stopping Mr. Trantham (based on his observations of Mr. Trantham swerving between lanes, having bloodshot red eyes, and appearing to fall asleep behind the wheel at a red light) and whether Corporal Fulton had probable cause to arrest Mr. Trantham (based on his observations of Mr. Trantham at the scene of the stop, as well as Mr. Trantham's admission of having consumed two beers). All of the material facts related to these issues are undisputed.

Mr. Trantham argues that Defendants may not rely on subjective observations in support of their Motion. He states that such evidence "cannot be considered verified" and is not supported by "objective proof." ECF No. 36-1 at 8, 9. Mr. Trantham provides no authority to support the proposition that the Court may only base a summary judgment ruling on evidence that is "verified" and "objective." Rule 56(a) contains no such requirement, providing only that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To the extent that Mr. Trantham

wishes to place any of Defendants' evidence in genuine dispute, he is required to support his argument by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). He cannot merely characterize Defendants' evidence as unverified and subjective to generate a genuine dispute of material fact. He must present evidence that contradicts Defendants' evidence and places it in dispute. To the extent that Mr. Trantham intended to argue that Defendants' evidence "cannot be presented in a form that would be admissible in evidence," the Court rejects the argument. It is axiomatic that witnesses are permitted to testify about matters that they observed, even if their personal observations are not, using Mr. Trantham's words, "verified" or "objective."

### C.    The § 1983 Claim

In Count One, Mr. Trantham claims that Defendants are liable under 42 U.S.C. § 1983 for the violation of his Fourth Amendment rights. Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Ogunsula v. Maryland State Police*, No. ELH-20-2568, 2021 WL 6105503, at *13 (D. Md. Dec. 23, 2021) (citing *Filarsky v. Delia*, 566 U.S. 377, (2012); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014)). Section 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266,

271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

Plaintiff claims that

> Defendants violated Plaintiff's Fourth Amendment rights and rights enforced against the States through the Due Process Clause of the Fourteenth Amendment of the United States to be free from unreasonable search and seizure of his person and property by unlawfully stopping Plaintiff's vehicle, and searching his person and vehicle without consent or the requisite probable cause.

ECF No. 1 ¶ 52.

### 1.    Traffic Stops Under the Fourth Amendment

The Fourth Amendment protects citizens "against unreasonable searches and seizures" by government authorities. U.S. Const. amend. IV. This protection extends to brief investigatory stops. *United States v. Drakeford*, 992 F.3d 255, 262 (4th Cir. 2021); *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc).

When a police officer stops an automobile and detains the occupant, the stop constitutes a seizure that implicates the Fourth Amendment, even if the purpose of the stop is limited and the detention is brief. *See Kansas v. Glover*, --- U.S. ----, 140 S. Ct. 1183, 1187 (2020). In general, a traffic stop begins when a motor vehicle "is pulled over for investigation of a traffic violation."

*Arizona v. Johnson*, 555 U.S. 323, 333 (2009). "When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019) (quoting *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014)); *Lewis v. State*, 398 Md. 349, 363 (2007) ("Clearly . . . the police have the right to stop and detain the operator of a vehicle when they witness a violation of a traffic law."). But probable cause is not required to effectuate a lawful stop.

The "usual traffic stop is more analogous to a so-called 'Terry stop.'" *Berkemer v. McCarthy*, 468 U.S. 420, 439 (1984). Pursuant to *Terry v. Ohio*, 392 U.S. 1, 30 (1968), and its progeny, a police officer may stop a motorist for investigative purposes without violating the Fourth Amendment so long as there is reasonable articulable suspicion, based on specific facts, that criminal activity is afoot.

"Reasonable suspicion" is "an objective standard." *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2014). It is "a particularized and objective basis for suspecting the person stopped of criminal activity . . . ." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

Courts analyze the property of a traffic stop under *Terry* "on two fronts." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011), *as amended* (Aug. 2, 2011). "First, we analyze whether the police officer's action was justified at its inception." *Id.* "Second, we analyze whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.*

"*Terry's* first prong is satisfied 'whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation.'" *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) (quoting *Arizona v. Johnson*, 555 U.S. 323, 327 (2009)). "Without question, such a violation may include failure to comply with traffic laws." *Id.*; *Digiovanni*, 650 F.3d at 506-07 (observing that when an officer makes a traffic stop on the basis of an observed violation of the Maryland law that prohibits following another vehicle too closely, the stop is supported by probable cause).

Under *Terry*'s second prong, "the seizure must be limited both in scope and duration." *Id.* at 507 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent. *Id.*

Because the "reasonable suspicion standard is an objective one, the officer's subjective state of mind is not considered." *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013); *Digiovanni*, 650 F.3d at 506 ("Any ulterior motive a police officer may have for making the traffic stop is irrelevant."); *see also Whren v. United States*, 517 U.S. 806 (1996) (explaining that where evidence supplies sufficient reasonable suspicion that traffic violation occurred, it is irrelevant whether the particular stopping officer's personal reason for stopping the car was pretextual); *United States v. Hassan El,* 5 F.3d 726, 730 (4th Cir. 1993) (explaining that under the "purely objective standard," the "subjective motivations of the officers involved" are of no consequence).

A warrantless arrest may flow from a lawful traffic stop where the officer has probable cause to believe that the suspect has committed a crime for which arrest is permissible. *See Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 460 (4th Cir. 2013); *United States v. Al-Talib*, 55 F.3d 923, 931 (4th Cir. 1995) ("To determine whether probable cause existed, courts look to

the totality of the circumstances known to the officers at the time of the arrest.") (citing *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)).

### 2.    Maryland's Illegal Lane Change Law

Under Maryland law, motorists must maintain a single lane. Md. Code, Transp. § 21-309(b) provides:

> A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so.

Maryland's Court of Appeals considered this statute in *Rowe v. State*, 363 Md. 424, 428 (2001). In *Rowe,* a Maryland State Police trooper observed a vehicle being driven in the slow lane of Interstate 95 at 1:00 a.m. Over the 1.2 miles that the trooper followed the vehicle, he observed the vehicle cross the white edge line of the right shoulder approximately eight inches, touch the rumble strips, and then immediately return to the slow lane. Thereafter, the trooper observed the vehicle touch the white edge line a second time. The trooper then stopped the vehicle. He explained his reasons for making the stop for failing to drive in a single lane:

> [A]t that time it was one o'clock in the morning. For me, it's when people are coming home from the bars the person could have possibly been intoxicated. It's also a time, it's late in the evening when people start to get tired and a lot of our accidents are people falling asleep at the wheel. I checked on the benefit of the driver after he failed to drive in a single lane.

363 Md. at 428.

The Court of Appeals held that the driver's "momentary crossing of the edge line of the roadway and later touching of that line did not amount to an unsafe lane change or unsafe entry onto the roadway, conduct prohibited by § 21–309," and that the traffic stop was not supported by probable cause or reasonable articulable suspicion. *Id.* at 441. The Court further held that even assuming that the police "community caretaking" function could ever support a stop in the context

presented in *Rowe*, the facts of the case did "not rise to the level necessary to justify the stop on the ground that it was a community caretaking stop for the purposes of providing assistance." *Id.*

*Rowe* has been distinguished by several cases. *See Blasi v. State*, 167 Md. App. 483 (2006); *Dowdy v. State*, 144 Md. App. 325, 330 (2002); *Edwards v. State*, 143 Md. App. 155, 171 (2002). In *Dowdy*, the Court of Special Appeals held that an officer's stop of a motorist who drifted between lanes going in the same direction on a four-lane highway was supported by probable cause that the motorist had violated § 21-309(b) and reasonable articulable suspicion that the motorist was driving while intoxicated. 144 Md. App. at 332. The court distinguished the facts in *Dowdy* from the facts in *Rowe*:

> [T]he Court in *Rowe* viewed the violation as a "momentary crossing of the edge line of the roadway and later touching of that line did not amount to an unsafe lane change . . . ." Clearly, there was no lane change in *Rowe*-the driver moved eight inches beyond the right edge of the road and touched the rumble strips and immediately returned to the paved road. By contrast, the vehicle in the present case crossed over from the slow lane into the passing lane and remained there for one-tenth of a mile twice. On the second occasion, one-fourth of the vehicle extended into the passing lane. This erratic driving created a potential danger to anyone who may have been proceeding lawfully in the passing lane.

*Id.* at 329-30. The court noted that "[t]his erratic driving was far more egregious than that presented in *Rowe*." *Id.* at 330. Because the officer observed the motorist's erratic driving and unlawful lane changes, the court held that the officer had probable cause to stop the motorist for violating § 21-309(b). *Id.* The court also found that given the totality of the circumstances, the officer had reasonable articulable suspicion to stop the motorist for driving while intoxicated. *Id.*

### 3.    Searches Incident to Arrest and Vehicle Inventory Searches

If a suspect is lawfully arrested during a traffic stop, police are allowed to conduct a warrantless search incident to the arrest of the person and of the vehicle. *Chimel v. California*, 395 U.S. 752 (1969); *Davis v. United States*, 564 U.S. 229, 234-35 (2011) (explaining that the rule in

*Chimel* has been modified to "a new, two-part rule under which an automobile search incident to a recent occupant's arrest is constitutional (1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest'"); *United States v. Robinson*, 414 U.S. 218, 235 (1973) ("[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."). The purpose of the search is to ensure the protection of the police and the preservation of evidence that may be concealed or destroyed. *Birchfield v. North Dakota*, 579 U.S. 438 (2016); *see also Belote v. State*, 411 Md. 104 (2009). In addition, police may perform "inventory searches" of impounded vehicles. *See United States v. Matthews*, 591 F.3d 230, 234 (4th Cir. 2009) ("Police officers frequently perform inventory searches when they impound vehicles or detain suspects."). These searches are designed to "protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* (quoting *Colorado v. Bertine*, 479 U.S. 367, 372 (1987)). However, inventory searches that are not performed in good faith, or that violate the uniform policy of a police department, will be found to be unreasonable. *Id.*

### 4. Qualified Immunity

Qualified immunity "protects law enforcement agents from federal claims when they act in objectively reasonable reliance on existing law." *Queen v. Prince George's Cnty.*, 188 F. Supp. 3d 535, 541 (D. Md. 2016) (quoting *Rockwell v. Mayor & City Council of Balt.*, No. RDB-13-3049, 2014 WL 949859, at *8 n.10 (D. Md. Mar. 11, 2014)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly

and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Wingate v. Fulford*, 987 F.3d 299, 311 (4th Cir. 2021) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A defendant is entitled to qualified immunity if either (1) the plaintiff's allegations fail to make out a violation of a constitutional right, or (2) the right at issue was not clearly established at the time of the alleged misconduct. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). In the Fourth Circuit, there is "a split burden of proof for the qualified-immunity defense." *Stanton v. Elliott*, No. 21-1197, 2022 WL 288012, at *4 (4th Cir. Feb. 1, 2022) (citing *Henry*, 501 F.3d at 377-78 & n.4). "The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Id.*

A right is clearly established when the law has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (citation omitted). "A right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson v. Prince George's Cnty., Maryland*, 893 F.3d 213, 221 (4th Cir. 2018). The Fourth Circuit has provided the following guidance when assessing whether a right was clearly established:

> [A court must] first look to cases from the Supreme Court, this Court, or the highest court of the state in which the action arose. In the absence of directly on-point, binding authority, courts may also consider whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority. The Supreme Court has ruled against defining a right at too high a level of generality and held that doing so fails to provide fair warning to officers that their conduct is unlawful outside an obvious case.

*Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020) (citations omitted); *see also Feminist Majority Found. v. Hurley*, 911 F.3d 674, 703-04 (4th Cir. 2018) (explaining that "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right" (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

The Supreme Court has stressed that the "specificity" of the legal principle is "especially important in the Fourth Amendment context." *District of Columbia v. Wesby*, --- U.S. ----, 138 S. Ct. 577, 590 (2018) (quoting *Mullenix*, 577 U.S. at 12). "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* "The central question is 'whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted.'" *Ogunsula*, 2021 WL 6105503, at *24 (quoting *Raub v. Campbell*, 785, F.3d 876, 882 (4th Cir. 2015)).

The Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

### 5.   The Traffic Stop Was Lawful

Corporal Fulton had probable cause to stop Mr. Trantham because he observed Mr. Trantham swerving his vehicle between lanes, in violation of Md. Code, Transp. § 21-309(b). As explained above, Corporal Fulton's testimony that he saw Mr. Trantham swerving between lanes while driving on Indian Head Highway is not in dispute. The facts of this case are comparable to those in *Dowdy*, where the court held that police may lawfully stop a motorist whose swerving

between lanes is more egregious than the "momentary crossing of the edge line of the roadway" in *Rowe*.[4] 144 Md. App. at 329-30.

In addition, Corporal Fulton had reasonable articulable suspicion to stop Mr. Trantham for driving while intoxicated, which is prohibited under Md. Code, Transp. § 21-902. *See Dowdy*, 144 Md. App. at 329-30 (explaining that an officer that observed a motorist drift between lanes going the same direction and driving "erratically"). In addition to observing Mr. Trantham swerving between lanes, Corporal Fulton observed Mr. Trantham "hitting the brakes a lot." ECF No. 34-2 at 5. At the intersection of Indian Head Highway and Livingston Road, Corporal Trantham observed Mr. Trantham's eyes to be bloodshot red, and it appeared to him that Mr. Trantham was falling asleep. *Id.* at 5, 7. Considering the totality of the circumstances and giving "due weight to factual inferences" that "[o]fficers with years of experience and specialized training may draw on their expertise to make," the Court finds that Corporal Fulton had, at a minimum, reasonable articulable suspicion to stop Mr. Trantham for drunk driving in violation of Md. Code, Transp. § 21-902. *See Dowdy*, 144 Md. App. at 331-32.

---

[4] When the state circuit court considered whether Corporal Fulton's stop of Mr. Trantham was lawful, the court focused on Corporal Fulton's subjective motivation for conducting the stop. *See* ECF No. 36-6. During the motion to suppress hearing held in state court, the parties presented evidence that Corporal Fulton's subjective reason for stopping Mr. Trantham was a concern for Mr. Trantham's safety (and not for violating Maryland's lane change law). It appears that the state court based its order suppressing the traffic stop on Corporal Fulton's subjective reasons for stopping Mr. Trantham. This Court reaches a different conclusion because the "reasonable suspicion standard is an objective one," "the officer's subjective state of mind is not considered," *George*, 732 F.3d at 299, and "[a]ny ulterior motive a police officer may have for making the traffic stop is irrelevant," *Digiovanni*, 650 F.3d at 506. There is no question that Corporal Fulton had an objectively lawful reason for stopping Mr. Trantham. That he based his decision to stop Mr. Trantham on a subjectively unlawful reason is of no moment.

### 6.     The Arrest and Subsequent Searches Were Lawful

The observations that Corporal Fulton made after he stopped Mr. Trantham supplied probable cause to arrest Mr. Trantham for driving while intoxicated, in violation of Md. Code, Transp. § 21-902. During the stop, Mr. Trantham admitted to consuming two beers prior to driving that night. Corporal Fulton smelled a strong odor of alcoholic beverage emanating from Mr. Trantham's person, which corroborated Mr. Trantham's admission that he had been drinking. These observations, coupled with Corporal Trantham's observation of Mr. Trantham's aggressive demeanor during the stop and his erratic driving prior to the stop, gave Corporal Fulton probable cause to arrest Mr. Trantham for violating § 21-902.

Because Corporal Trantham lawfully arrested Mr. Trantham, he was authorized to conduct a search of Mr. Trantham's person incident to the arrest. *See Chimel*, 395 U.S. 752. And because Corporal Trantham lawfully impounded Mr. Trantham's vehicle, the Defendants were also authorized to conduct an inventory search of the vehicle. *Matthews*, 591 F.3d at 234.

For these reasons, the Court finds that Corporal Fulton and Officer Ige did not violate Mr. Trantham's Fourth Amendment rights: the stop was supported by probable cause that Mr. Trantham had unlawfully changed lanes and reasonable articulable suspicion that Mr. Trantham was driving while intoxicated; the arrest was supported by probable cause; the search of Mr. Trantham's person was a lawful search incident to arrest; and the search of Mr. Trantham's vehicle was a lawful inventory search. Accordingly, Corporal Fulton and Officer Ige are entitled to summary judgment on Count One.

### 7.     Corporal Fulton and Officer Ige Are Entitled to Qualified Immunity

As explained above, Corporal Fulton and Officer Ige did not violate Mr. Trantham's Fourth Amendment Rights. But even assuming that Mr. Trantham's Fourth Amendment rights were

violated, Corporal Fulton and Officer Ige are entitled to qualified immunity because Defendants have established that their conduct did not violate clearly established statutory or constitutional rights.

Notably, Mr. Trantham has not pointed to any relevant authority that Corporal Fulton lacked probable cause to stop Mr. Trantham for violating Maryland's lane change law, Md. Code, Transp. § 21-309(b). As explained above, *Rowe* is distinguishable from the facts in this case. Further, Mr. Trantham has not identified any authority that Corporal Fulton lacked reasonable articulable suspicion to stop Mr. Trantham for driving while intoxicated, or that he lacked probable cause to arrest Mr. Trantham based on the totality of his observations on the night of the incident. And Mr. Trantham has cited not any authority that Corporal Fulton lacked authority to conduct a search of Mr. Trantham's person incident to the arrest, that he lacked authority to conduct an inventory search of his vehicle, or that he performed the inventory search in bad faith or in violation of department policy. Corporal Fulton and Officer Ige have met their burden to show that no clearly established law existed at the time that prohibited Defendants from stopping Mr. Trantham for violating Maryland's lane change law, Md. Code, Transp. § 21-309(b), and to investigate whether Mr. Trantham was violating Maryland's driving while intoxicated law, Md. Code, Transp. § 21-902, given the observations that Corporal Fulton made prior to stopping Mr. Trantham. Corporal Fulton and Officer Ige have also met their burden to show that no clearly established law existed at the time that prohibited Defendants from arresting Mr. Trantham for violation of Md. Code, Transp. § 21-902, given Corporal Fulton's observations of Mr. Trantham's erratic driving and unusual behavior before the stop, and given both officers' observations of Mr. Trantham's conduct during the stop (including his admission of having consumed alcohol before driving and the strong odor of alcoholic beverage observed to be emanating from his person). Finally, Corporal Fulton

and Officer Ige have met their burden to show that no clearly established law existed at the time that prohibited the Defendants from searching Mr. Trantham's person incident to his arrest, or from conducting an inventory search of his vehicle before it was impounded.

A reasonable officer standing in the place of Corporal Fulton or Officer Ige would have believed that the stop, arrest, and search of Mr. Trantham and his vehicle were all lawful. *See Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) ("A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful." (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987))). For these reasons, even assuming that Mr. Trantham could establish the violation of his Fourth Amendment rights that he alleges in Count One, Corporal Fulton and Officer Ige are entitled to qualified immunity. On this alternative basis, Corporal Fulton and Officer Ige are entitled to summary judgment on Count One.

### 8.    The County's Municipal Liability

Because Mr. Trantham's Fourth Amendment rights were not violated, there is no basis for him to hold the County liable for any violation of § 1983 (Count One), and the Court will award summary judgment to the County on that basis. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). Alternatively, even assuming that Mr. Trantham's Fourth Amendment rights were violated, the County is still entitled to summary judgment on Count One.

"[I]t is by now well settled that a municipality is only liable under section 1983 if it causes such a deprivation through an official policy or custom." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)). A policy or custom for which a municipality may be held liable can arise in four ways:

(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an

omission, such as a failure to properly train officers, that "manifest [s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle*, 326 F.3d at 471 (quoting *Carter*, 164 F.3d at 218).

To impose liability on a municipality, a plaintiff must "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation" of constitutional rights. *Whetstone v. Mayor & City Council of Baltimore City*, No. ELH-18-738, 2019 WL 1200555, at *10 (D. Md. Mar. 13, 2019) (quoting *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994)). "Liability arises only where the constitutionally offensive acts of city employees are taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (citing *Monell*, 436 U.S. at 694). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

"A policy or custom that gives rise to § 1983 liability will not 'be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees.'" *Whetstone*, 2019 WL 120555, at *11 (quoting *Milligan*, 743 F.2d at 230). "Only when a municipality's conduct demonstrates a 'deliberate indifference' to the rights of its inhabitants can the conduct be properly thought of as a 'policy or custom' actionable under § 1983." *Id.* (citing *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997)).

Even assuming that Mr. Trantham's Fourth Amendment rights were violated, Mr. Trantham has failed to "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation" of his

constitutional rights. *Whetstone*, 2019 WL 1200555, at *10. Mr. Trantham's Complaint does not allege that the County had an official policy or custom that gives rise to his § 1983 claim. And there is no evidence that any violations were the result of any official policy or custom. Notably, Mr. Trantham does not make any substantive argument on this point. Accordingly, the County is entitled to summary judgment on Count One.

### D.     The State Law Claims

The remaining claims in the Complaint (Counts Two, Three, and Five) all arise under state law. *See* ECF Nos. 1 & 36-1 at 17, 23-24 (explaining that the claims arise under Maryland law). Because the Court will award summary judgment to Defendants on Mr. Trantham's § 1983 claim, the Court must decide whether to exercise supplemental jurisdiction over Mr. Trantham's remaining state law claims. Supplemental jurisdiction is governed by 28 U.S.C. § 1367.

Under § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." *See Little v. Mayor & City Council of Ocean City*, No. ELH-18-360, 2019 WL 4689238, at *29 (D. Md. Sept. 26, 2019). The Fourth Circuit has stated that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). Because the Court has awarded summary judgment to Defendants on the only federal claim (Count One), the Court will exercise its discretion to dismiss Mr. Trantham's remaining state law claims. *See, e.g. Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 500 (D. Md. 2005) ("Because the court will dismiss the claims over which it has original jurisdiction, the court will decline to exercise supplemental jurisdiction over the remaining state law claims."). Mr. Trantham's claims arising under Maryland law will be dismissed without prejudice.

Mr. Trantham is cautioned that, under 28 U.S.C. § 1367(d), state law claims brought in federal court under supplemental jurisdiction that are dismissed "shall be tolled" while the claim is pending in federal court, and for a period of 30 days after dismissal. In *Turner v. Kight*, 406 Md. 167, 189 (2008), the Maryland Court of Appeals observed that § 1367(d) "serves to suspend the running of a State statute of limitations from the time the State-law claim is filed in U.S. District Court until 30 days after (1) a final judgment is entered by the U.S. District Court dismissing the pendant State-law claims, or (2) if an appeal is noted from that judgment, issuance of an order of the U.S. Court of Appeals dismissing the appeal or a mandate affirming the dismissal of those claims by the District Court."

## IV.    CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment (ECF No. 34) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is granted as to Count One, and the Court will enter judgment in favor of Defendants on this count. The remainder of the Motion is denied in light of the Court's dismissal of the remaining state law claims without prejudice, pursuant to 28 U.S.C. § 1367(d). An accompanying order follows.


February 16, 2022                                    _____/s/_____
Date                                                             Timothy J. Sullivan
                                                                   United States Magistrate Judge